Irving H. **LEVIN** and Harold A. Lipton, Plaintiffs,

v.

**NATIONAL BASKETBALL ASSOCIATION, et al., Defendants.**

**No. 73 Civ. 561.**

United States District Court, S. D. New York.

Oct. 8, 1974.

Seymour F. Simon, Chicago, Ill., for plaintiffs.

David J. Stern, George G. Gallantz, Donald A. Kaplan, Jeffrey A. Mishkin, Proskauer Rose Goetz & Mendelsohn, New York City, for defendants.

## OPINION

OWEN, District Judge.

In this antitrust action, defendants move for summary judgment dismissing the complaint and plaintiffs cross-move for partial summary judgment on all issues except damages.

The plaintiffs, two businessmen, in 1972 had an agreement to buy the Boston Celtics basketball team, one of the 17-member National Basketball Association.

N.B.A., as its constitution recites, is a joint venture "organized to operate a league consisting of professional basketball teams each of which shall be operated by a member of the Association." It has been in existence since 1946. Each of its joint venturers holds a franchise to operate a team. While the teams compete vigorously on the basketball court, the joint venturers are dependent upon one another as partners in the league format to make it possible. N.B. A. operates through its Board of Governors which consists of one governor designated by each member. Action by the Board on a transfer of membership requires the affirmative vote of three-quarters of the members of the Board.

When plaintiffs applied to the N.B.A. the Celtics to a partnership which the plaintiffs proposed to form, that motion failed to carry at the meeting of the Board of Governors on June 15, 1972, there being two votes in favor, thirteen votes opposed and one not present.

Plaintiffs immediately demanded and were granted a personal hearing before the Board. Following the presentation of their case a second vote was taken. It was, however, to identical effect.

There is a sharp dispute on the reason for the rejection. Plaintiffs contend that they were rejected because of their friendship and business associations with one Sam Schulman, owner of the Seattle SuperSonics, who was an anathema to the other members of the league. Plaintiff Levin testified in a deposition that he was told the "real" reason by Basketball Commissioner Kennedy and Richard Bloch, President of the Phoenix Suns and Chairman of the, N.B.A. Finance Committee. According to Levin, Kennedy said:

"I don't have to draw you a picture. You guys are friendly with Sam Schulman. He is a pain in the neck

to the league, and they are obviously worried that if you fellows are also owners, that you will side with Sam Schulman in all matters in the future and cause the league more troubles than they now have with Sam as it is."

and according to Levin, Bloch said:

"You are with Sam Schulman. He has been a craw in the throat of these owners. He is a renegade and a rebel, a troublemaker, and he just doesn't play their game, and they are obviously worried that you fellows, being close to Sam, are going to be siding with him on any matters that come up before the NBA."

On the other hand, the reason given by the N.B.A. for the rejection was that

the business association between the plaintiffs and Schulman violated the "conflict of interest" provision of the N.B.A. constitution. That provision reads: A member shall not exercise control, directly or indirectly, over any other member of the Association.[1] This provision is necessary, N.B.A. claims, in order that the league may enjoy public support because there is in fact, and the public believes there is, intense competition in the league framework between the *teams* operated by the N.B.A. members.

In any event plaintiffs, rejected, sold their rights in the Celtics elsewhere and commenced this action.

In order to survive defendants' motion for summary judgment, plaintiffs must

---

1. In their answers to interrogatories in this case, all the active dissenting clubs assigned the conflict with Schulman as the reason for the rejection. San Francisco's answer, the fullest, reads:

> Because of a possible conflict of interest created by the fact that both Levin and Lipton and Samuel Schulman were officers and employees of the same corporation and were close friends, which fact would also create a bad public image and be difficult to explain to the public. Also, the financial ability of Levin and Lipton to perform their obligations had not been demonstrated by the usual background analysis; the fact that they owned stock in the Seattle franchise; the possible conflict which existed by virtue of the fact that both of them and Samuel Schulman were officers and employees of National General Corporation and worked in the same office, which would appear to create an interlocking ownership situation; the strong possibilities [sic] that this situation would create unfavorable public reaction and suspicion.

The facts as to this, amplified on this record, and undisputed, are: Plaintiffs are presently shareholders and officers of First Northwest Industries of America, Inc., the NBA member which operated the Seattle SuperSonics basketball team. The President and principal shareholder of First Northwest Industries, Inc. is Samuel Schulman, who is the SuperSonics' representative to the NBA Board of Governors.

In 1967, Levin, Lipton, Schulman and Eugene Klein acquired the NBA "expansion" franchise to operate the SuperSonics. All four were at that time shareholders, officers and directors of National General Corpora-

tion a large entertainment, publishing and insurance conglomerate headquartered in California, where the four resided.

Although their titles in National General changed from time to time, Levin, Lipton, Schulman and Klein had been with National General since at least 1963, and as of 1972, when the acts complained of in the complaint occurred, Klein was Chairman of the Board of Directors and Chief Executive Officer of National General, Schulman was Vice Chairman of the Board of Directors and Chairman of its Executive Committee, Levin was President and Chief Operating Officer and Lipton was First Vice-President, Secretary and General Counsel. Levin and Klein were also members of the Executive Committee and Lipton attended all meetings of the Executive Committee as Secretary of the corporation. Lipton has acted as Schulman's personal attorney for a number of years and, on occasion, as counsel to Levin and Klein as well.

Because of their relationship to National General, before Levin, Lipton, Klein and Schulman purchased the SuperSonics in 1967 they first offered the opportunity to the corporation.

Schulman, Klein, Levin and Lipton entered into a number of investments together—including the purchase by Levin, Schulman and Klein of a professional football team. In 1969, when the corporation to which they had transferred the ownership of the SuperSonics "went public", the Registration Statement reported that the nine main shareholders (including Levin, Lipton, Schulman and Klein) "[d]uring the preceding ten years . . . have had numerous common investment interests."

demonstrate that the conduct complained of is a violation of the antitrust laws. While it is true that the antitrust laws apply to a professional athletic league,[2] and that joint action by members of a league can have antitrust implications [3] this is not such a case. Here the plaintiffs wanted to *join* with those unwilling to accept them, *not to compete with them*, but to be partners in the operation of a sports league for plaintiffs' profit. Further, no matter which reason one credits for the rejection, it was not an anti-competitive reason. Finally, regardless of the financial impact of this rejection upon the plaintiffs, if any,[4] the exclusion of the plaintiffs from membership in the league did not have an anti-competitive effect nor an effect upon the public interest.[5] The Celtics continue as an operating club, and indeed are this year's champion.

█ The law is well established that it is competition, and not individual competitors, that is protected by the antitrust laws. Checker Motors Corp. v. Chrysler Corp., 283 F.Supp. 876 (S.D. N.Y.1968) aff'd, 405 F.2d 319 (2d Cir.),

cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

█ It is also clear that where the action the plaintiffs attack, the rejection from co-partnership, has neither anti-competitive intent nor effect,[6] that conduct is not violative of the antitrust laws. Bay City-Abrahams Bros. Inc. v. Estee Lauder Inc., 375 F.Supp. 1206 (S. D.N.Y.1974).

█ While summary judgment should be sparingly granted in antitrust litigation, Poller v. Columbia Broadcasting System Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), nevertheless, the mere filing of an antitrust complaint does not entitle the plaintiff to a full-dress trial in the absence of "significant probative evidence tending to support the complaint." First National Bank v. Cities Service Corp., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). In the recent case of Coniglio v. Highwood Services, Inc., 495 F.2d 1286, p. 1293 (2d Cir. 1974), the Court of Appeals stated, that there was a

total failure to demonstrate any adverse effect on competition, actual or

---

2. Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

3. Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C.D.Cal.1971).

4. Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963). Defendants assert an absence of damage, but I need not resolve this question.

5. Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.1956) ; aff'd, 239 F. 2d 176 (4th Cir. 1956), cert. denied, 355 U. S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

6. In reaching this conclusion I have considered and reject the applicability to this case of the holding of Denver Rockets v. All-Pro Management, Inc., *supra*, strongly urged by plaintiffs. There, a by-law of the National Basketball Association which prohibited a qualified player from negotiating with any team until four years after his high school class graduation was declared a "per se" violation as a "group boycott". The distinguishing difference, in my opinion, is that the limiting by-law attacked in *Denver Rockets* prevented a player from entering and *competing* with other players in the *players'* market, whereas in this case the plaintiffs wanted to become partners with, *not competitors of*, those who excluded them. I find more applicable the rational of San Francisco Seals, Ltd. v. National Hockey League, 379 F.Supp. 966, (C.D.Cal., 1974). In that case the Court found no antitrust violations and dismissed where the Board of Governors of the National Hockey League refused to permit plaintiff to transfer its franchise from San Francisco to Vancouver, B. C., where plaintiff presumably thought it could have a more profitable operation.

Further, to the extent *Denver Rockets* may be viewed as applying the *per se* rule in the absence of anti-competitive purpose, the decision, which was not appealed, is not in accord with the law in its own Circuit. See Bridge Corp. of America v. American Contract Bridge League, 428 F.2d 1365 (9th Cir. 1970), cert. denied, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971) ; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) ; Deesen v. Professional Golfers Ass'n. of America (PGA), 358 F.2d 165 (9th Cir.), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).

potential, an issue perfectly well suited to objective, statistical analysis. In such instances, summary judgment is properly granted to lower the curtain on costly litigation where it is clear beyond cavil that one side simply has no support for its version of alleged facts.

Since there was no exclusion of plaintiffs from *competition* with the alleged excluders, nor anti-competitive acts by them and no public injury occasioned thereby, the defendants' acts did not constitute a violation of the antitrust laws and defendants' motion for summary judgment is granted. Plaintiffs' motion for partial summary judgment is denied and the action is dismissed. Settle order on 14 days' notice.