**MID–SOUTH GRIZZLIES, et al.**

v.

**NATIONAL FOOTBALL LEAGUE, et al.**

Civ. A. No. 79–4373.

United States District Court,
E.D. Pennsylvania,
Civil Division.

Nov. 5, 1982.

Richard A. Sprague, Edward H. Rubenstone Sprague, Goldberg & Rubenstone,

Gary Green, Robert A. Davitch, Sidkoff, Pincus, Greenberg & Green, Philadelphia, Pa., for plaintiffs.

Edwin P. Rome, Morris L. Weisberg, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Hamilton Carothers, James C. McKay, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Pending before the court is Defendants' Motion for Summary Judgment. Although the submissions regarding the motion are voluminous, they in essence address one issue: does a professional sport league's refusal to accept for membership a qualified applicant for a franchise in an area where no current league team is located violate Sections 1 or 2 of the Sherman Act? Based on the undisputed material facts and the reasons set forth below, I believe not. Therefore, Defendants' Motion for Summary Judgment is granted.

*The Team Rosters*

The offensive team (plaintiffs) is the Mid-South Grizzlies, a joint venture established on November 1, 1975 consisting of the Mid-South Grizzlies, a Tennessee limited partnership,[1] Consolidated Industries, Inc., a California corporation, and John Edward Bosacco, an individual. The defensive line-up (defendants) is composed of the National Football League ("NFL"), the twenty-eight individual NFL football teams, and calling the signals, Pete Rozelle, the NFL Commissioner.

*Plaintiffs' Game Plan*

In the fall of 1975, plaintiffs applied to the NFL in the hope of obtaining a franchise for the Memphis, Tennessee area. Along with their application, they submitted an application fee as required by the NFL Constitution and By-Laws. This fee was returned to the plaintiffs a few weeks later. In December 1975, plaintiffs met with the NFL Expansion Committee. This committee was responsible for the investigation and planning for the addition of new

---

1. The partnership's Chief Executive Officer is John F. Bassett.

NFL teams. Its members at the time of plaintiffs' application were Daniel M. Rooney, President of the Pittsburgh Steelers, Gerald H. Phipps of the Denver Broncos, Louis Spadia of the San Francisco '49ers and Texas Schramm of the Dallas Cowboys. At this meeting plaintiffs were told that further expansion of the NFL at that time was in their opinion unwise and that they would recommend to the full NFL membership that no further expansion be considered for the moment.

Plaintiffs met with defendants on at least two more occasions. One of these meetings was with the entire NFL membership. A few months after their presentation to the full membership, the NFL passed on March 17, 1976 the following resolution:

> RESOLVED, after thorough review of the major problems presently confronting the NFL, that the member clubs do not believe they can formally commit to specific expansion arrangements at this time. The clubs do, however, reaffirm their desire to bring total League membership to thirty teams as soon as possible after resolution of current problems and assimilation of the new Tampa Bay and Seattle teams. At that time, Memphis and Birmingham, which have most actively sought admission in recent months,

will be among the cities receiving strongest consideration for NFL franchises.

The problems referred to in the resolution were many. Around the time of plaintiffs' application, no collective bargaining agreement with the Players Association had been in effect for two seasons. In addition a district court in California had held several player restrictions to be unlawful.[2] A few months later another district court in California enjoined application of the "Rozelle rule" by the NFL. Pending in a third district court was a case attacking the NFL college draft.[3] Near the end of 1975, another district court found the "Rozelle rule" unlawful.[4] Also during this time period efforts were afoot to make permanent legislation which prevented the practice of blacking out television coverage of sold out home games in the area surrounding the home team's stadium. In addition, the NFL Players Association threatened to challenge the procedures the NFL implemented to man the new Tampa Bay and Seattle teams.[5] The players filed suit in March 1976.[6]

Because defendants had already decided expansion anywhere at the time of plaintiffs' application was not prudent, they never fully considered plaintiffs' application on the merits.[7] Defendants did, however, tell

---

2. The court found the "Rozelle rule," the "draft rule," the "one-man rule" and the "tampering rule" violative of the Sherman Act. *Kapp v. National Football League*, 390 F.Supp. 73 (N.D. Cal.1974), *aff'd*, 586 F.2d 644 (9th Cir.1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

3. *Smith v. Pro-Football, Inc.*, 420 F.Supp. 738 (D.D.C.1976), *aff'd in part and rev'd in part*, 593 F.2d 1173 (D.C.Cir.1978).

4. *Mackey v. National Football League*, 407 F.Supp. 1000 (D.Minn.1975), *aff'd in part and rev'd in part*, 543 F.2d 606 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

5. These franchises were awarded in 1974. They did not begin actual play, however, until 1976. In order to man these new teams, each one was permitted to draft up to three men from each existing team except a minimum of thirty-two men placed on a protected list. They were also given preferential selection rights in the NFL college draft. Exhibit 4F to

Rooney Affidavit, Motion of Defendants for Summary Judgment and Addenda.

6. The NFL's litigation problems have continued. Recently, the Second Circuit affirmed a district court's finding that the NFL cross ownership ban preventing NFL owners from owning any other major professional sports team violated the Sherman Act. *North American Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 499 (1982). In May 1982, the NFL also lost a fight to prevent the owner of the Oakland Raiders from moving his team to the Los Angeles area. *Los Angeles Memorial Coliseum Commission v. National Football League*, Civ. No. 78–3523–HP (C.D.Cal.). And of serious consequence to the owners, players and fans is the NFL players' strike which began in September 1982.

7. As a result of this lawsuit, defendants have since examined the merits of plaintiffs' application and have found it, in their eyes, wanting. Because I am assuming plaintiffs were qualified

plaintiffs they would receive serious consideration in the future when definite expansion plans were formulated.

Plaintiffs finally filed this lawsuit in December 1979. In their Complaint, plaintiffs allege that part of defendants' motive in rejecting plaintiffs' application was to retaliate against plaintiffs for their past involvement in the now defunct rival of the NFL, the World Football League ("WFL").[8] The WFL was formed in 1973 and played games in the entire 1974 football season and in the 1975 season until October 1975. Several of its teams had competed directly with NFL teams for fan support and revenue.

In any event plaintiffs assert that defendants' actions constitute an unlawful group boycott and an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.[9] Moreover, they allege that defendants' behavior constitutes monopolization violative of Section 2 of the Sherman Act.[10]

*The Defensive Strategy*

Defendants respond with several defenses. First they deny their actions were motivated by animus towards plaintiffs because of their WFL involvement. Defendants also contend that their behavior was neither a group boycott nor an unreasonable restraint of trade. In addition they assert there was no contract, combination or conspiracy as required by Section 1 because the NFL, in this case, acted as a single entity. Moreover, they assert they have performed no act of monopolization proscribed by Section 2. Lastly, they contend that plaintiffs Bosacco, Consolidated and the joint venture are not real parties in interest and thus lack standing to sue. Because I find that defendants' conduct is neither an unlawful group boycott, an unreasonable restraint of trade nor an act of monopolization, I will not make a call on defendants' remaining contentions.[11]

*The Pregame Show*

The NFL is well known to any football fan. It is an unincorporated association comprised of twenty-eight teams located throughout the United States. All but one team are privately owned and operated. Although these teams "compete" with one another on the playing field and for the top players, they act jointly in many aspects of their enterprise as the term league necessarily implies. For example, they set rules for the games, schedule contests, provide for joint marketing of national broadcast rights and, of importance here, decide the locations and owners of new franchises.[12] The rules which govern the awarding of new franchises are contained in the NFL's Constitution and By-Laws.[13] Each team

for a franchise in deciding this motion, I make no finding regarding this particular contention of defendants.

8. Mr. Bosacco owned and operated the Philadelphia Bell; the limited partnership owned and operated the Memphis Southmen, also known as the Memphis Grizzlies; and Consolidated owned and operated the Portland Storm.

9. Section 1 reads in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, ... is declared to be illegal...."

10. Section 2 provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, ... shall be deemed guilty of a felony...."

11. The Second Circuit on facts different from this case recently rejected the single entity theory in *North American Soccer League v. National Football League,* 670 F.2d 1249 (2d Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 499 (1982).

12. An award of a new franchise requires three-quarters approval of the then existing franchises. Constitution and By-Laws for the National Football League for 1975, ¶ 3.3(C).

13. The Constitution and By-Laws for the National Football League at the time of plaintiffs' application contained the following provisions governing the awarding of a franchise:

3.1(a) Membership in the League shall be limited to the twenty six (26) member clubs specified in Section 4.3(A) hereof and such new members as may be thereafter duly elected.

(b) The admission of a new member within the home territory of a club is prohibited unless approved by the unanimous consent of all members of the League.

3.2 Any person, association, partnership, corporation, or other entity of good repute

derives a great deal of its revenue through jointly generated income. For example, money resulting from national broadcasting contracts is shared among league members on agreed upon formulae. Other revenue, such as the sale of team paraphernalia and local advertising, is individually generated and not shared with other NFL members.

The NFL has its roots early in this century. Throughout the years several other leagues appeared usually only for a short time and without much success. One entry, however, did succeed. In the early 1960's the American Football League ("AFL") was formed with eight teams. The two leagues were run separately until 1966 when the two agreed to a merger to be fully imple-

mented by 1970.[14] At the time they entered the merger agreement, the NFL had fifteen teams and the AFL had nine.

Expansion beyond these twenty-four teams has been sporadic. In 1967, the NFL awarded a franchise to New Orleans. A year later, the AFL added Cincinnati. By the time the merger was completed, the NFL consisted of twenty-six teams and stayed at that number for several years. In 1974, a year before plaintiffs' application, plans were made to add two more franchises in Tampa Bay and Seattle. These two teams first became active in 1976, shortly after plaintiffs' application. Each new team was manned by taking a maximum of

organized for the purpose of operating a professional football club shall be eligible for membership except:

(a) No corporation, association, partnership or other entity not operated for profit nor any charitable organization or entity not presently a member of the League shall be eligible for membership.

3.3(A) Each applicant for membership shall make a written application to the Commissioner. Such application shall describe the type of organization and shall designate the city in which the franchise of the applicant shall be located; such application shall further describe and contain the following information:

(1) The names and addresses of all persons who do or shall own any interest or stock in the applicant, together with a statement that such persons will not own or hold such interest or stock for the benefit of any undisclosed person or organization.

(2) A detailed balance sheet of such company as of the date of organization and a pro forma statement as of the time it shall commence actual operation. A written financial statement shall be required from the applicant and from anyone owning an interest in any applicant, including stockholders and partners.

(3) If applicant is a corporation, a certified copy of the Articles of Incorporation, By-Laws and share certificate shall accompany such application provided, however, if the organization of such corporation has not been commenced or completed a detailed statement summarizing the proposed plan of operation and the capital structure thereof shall be furnished.

(4) If applicant is partnership [sic], unincorporated association or other entity, a certified copy of the Articles of Co-Partnership or organization agreement shall accompany such application.

(5) The names and addresses of all officers and directors.

(6) All applications shall contain a representation that upon acceptance, the applicant will subscribe to and agree to be bound by the Constitution, By-Laws, Rules and Regulations of the League and any amendments or modifications thereof.

(B) Each application for membership shall be accompanied by a certified check for Twenty-Five Thousand Dollars ($25,000.00). Upon approval of any application for membership, an additional Twenty-Five Thousand Dollars ($25,000.00) shall be paid to the League. If any application for admission is rejected, the League shall repay to the applicant the sum of Twenty-Five Thousand Dollars ($25,000.00) paid by the applicant at the time of such application, less all expenses reasonably incurred in connection with the consideration and investigation of such application.

(C) Upon receipt of any application for membership in the League, the Commissioner shall conduct such investigation thereof as he deems appropriate. Following the completion of such investigation, the Commissioner shall submit the application to the members for approval together with his recommendation thereon, and such information thereon that the Commissioner deems pertinent. Each proposed owner or holder of any interest in a membership, including stockholders in any corporation, members of a partnership and all other persons holding any interest in the applicant must be individually approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the members of the League.

14. Congress exempted the merger from the antitrust laws. Pub.L. No. 89–800, 80 Stat. 1515 (codified at 15 U.S.C. § 1291 (1976)).

three players from each previously established team. No new NFL franchise has been awarded to anyone since the time of plaintiffs' application. Although the NFL does expect to award two more franchises in the foreseeable future, they have not decided when, where or to whom.

No current NFL franchise operates in the Memphis area. The closest NFL team location is St. Louis, Missouri which is two hundred and eighty-one miles from Memphis.[15]

*The Rules of the Game*

■ Rule 56 of the Federal Rules of Civil Procedure authorizes a district court to enter summary judgment where "the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). Only those facts which "tend to prove or disprove elements of the disputed claim for relief" need be examined before a decision is rendered. *Chuy v. Philadelphia Eagles,* 407 F.Supp. 717, 723 n. 9 (E.D.Pa.1976), *citing McCormick on Evidence* § 185, at 434–35 (2d ed. E. Cleary 1972). The court must recognize, however, that summary judgment is a drastic remedy, resolve all doubts as to the existence of genuine issues of fact against the moving party, and view all inferences from the facts in the light most favorable to the parties opposing the motion. *Continental Insurance Co. v. Bodie,* 682 F.2d 436 (3d Cir.1982).

■ The Supreme Court has cautioned that summary judgment should be used sparingly in antitrust cases. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). However as my former colleague then District Judge, now Circuit Judge, Becker noted, a legion of cases granting either partial or total summary judgment in antitrust cases have been upheld by the Supreme

Court and the Third Circuit since *Poller.*[16] *Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 513 F.Supp. 1100, 1140 & n. 53 (E.D.Pa.1981), *appeal docketed,* Nos. 81–2331, 81–2332 and 81–2333 (3d Cir. Aug. 24, 1981). In fact courts have since recognized that summary judgment is particularly apropos in antitrust cases:

> [T]he very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, ... the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation.... If a trial would serve no useful purpose, summary judgment is proper.

*Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1167 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). *See In Re Municipal Bond Reporting Antitrust Litigation,* 672 F.2d 436 (5th Cir.1982); *Solomon v. Houston Corrugated Box Co., Inc.,* 526 F.2d 389 (5th Cir.1976). Although a party's right to trial should be carefully guarded, it is nonetheless clear that the filing of an antitrust complaint cannot insure a right to trial absent any significant probative evidence supporting the party's claims. *Harold Friedman, Inc. v. Kroger,* 581 F.2d 1068 (3d Cir.1978), *citing First National Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Such a party should not be permitted to proceed to trial in the hope of developing evidence to support his claims. *Parsons v. Ford Motor Co.,* 669 F.2d 308 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). Moreover, summary disposition of antitrust cases is proper even when employing the Rule of Reason. *See Evans v. S.S. Kresge Co.,* 544 F.2d 1184 (3d Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53

---

**15.** Mileage was provided by the American Automobile Association.

**16.** One court has stated that the *Poller* case has become the "magic wand waved indiscrimi-

nately by those opposing summary judgment motions in antitrust actions." *Mutual Fund Investors, Inc. v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir.1977).

L.Ed.2d 1092 (1977). Thus summary judgment is an appropriate vehicle for disposing of this matter.

Under the special rules of this match-up if the offensive team does not score, the defendants win.

*The Kickoff*

Defendants first filed their motion for summary judgment in March of 1981. In their initial response and again at oral argument, plaintiffs contended that defendants' motion was premature as plaintiffs had not had the opportunity for adequate discovery.[17] *See Mannington Mills, Inc. v. Congoleum Industries, Inc.,* 610 F.2d 1059 (3d Cir.1979). Agreeing that defendants were "offsides", I entered a Memorandum Order permitting plaintiffs to pursue their discovery inquiry but limiting the scope solely to matters relating to the NFL's decision not to grant plaintiffs an NFL franchise in Memphis and to the NFL's prior practices and standards concerning the awarding of new franchises since the NFL–AFL merger.[18] Plaintiffs subsequently received additional material and deposed at length the four members of the expansion committee and Mr. Rozelle.

■ Defendants renewed their motion for summary judgment in December 1981. Again plaintiffs asserted that still they had not had sufficient discovery. It is well settled that the district court has discretion in controlling the discovery process. *Montecatini Edison S.p.A. v. E.I. du Pont de Nemours & Co.,* 434 F.2d 70 (3d Cir.1970). Where appropriate, a district court may limit a party's discovery as long as they are able to fully develop their case. *Staffin v. Greenberg,* 672 F.2d 1196 (3d Cir.1982). *See First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) (summary judgment in

antitrust suit affirmed despite petitioner's claim it had been unduly restricted in its discovery).

Plaintiffs have had more than sufficient discovery to fully develop their case. All of the outstanding requests to which defendants have refused to respond are not calculated to lead to relevant evidence necessary to resolving this matter. As a result, I find that this case is now ripe for a decision on the merits.

*The First Half*

■ I will first address plaintiffs' Section 1 claim.[19] In the development of antitrust law some cases viewed group boycotts as *per se* violations. *See, e.g., Fashion Originators' Guild of America v. Federal Trade Commission,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Klors, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). However it became apparent that not all group decisions refusing to do business with someone should be measured against the strict *per se* criteria enunciated in these earlier cases. *See Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). *See also* L. Sullivan, *Handbook of the Law of Antitrust* § 90 (1977). *Per se* violations should be found only where the involved agreements are so clearly anticompetitive and lacking in any redeeming quality that they can be conclusively presumed illegal without any further inquiry. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). A threshold question here then is whether the decision of a professional sports league to deny an assertedly qualified applicant a franchise is unquestionably anticompetitive.

17. At that time plaintiffs had several outstanding discovery requests and had not yet deposed any of the defendants.

18. Plaintiffs had sought and received a volume of other material from defendants as a result of earlier discovery requests.

19. Unlike professional baseball, professional football does not enjoy the good fortune of being totally exempt from the antitrust laws. *Flood v. Kuhn,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). In two areas only does football escape the antitrust laws' watchful eye: joint agreements concerning the telecasting of games; and the merger in 1966 of the AFL with the NFL, 15 U.S.C. § 1291 (1976).

■ Almost twenty years ago, Judge Grim of this court was called upon to decide the legality of the television policies of the NFL in *United States v. National Football League*, 116 F.Supp. 319 (E.D.Pa.1953).[20] There he pointed out the differences between the production of professional sporting contests and normal business activity:

> Professional football is a unique type of business. Like other professional sports which are organized on a league basis it has problems which no other business has. The ordinary business makes every effort to sell as much of its product or services as it can. In the course of doing this it may and often does put many of its competitors out of business. The ordinary businessman is not troubled by the knowledge that he is doing so well that his competitors are being driven out of business.
>
> Professional teams in a league, however, must not compete too well with each other in a business way. On the playing field, of course, they must compete as hard as they can all the time. But it is not necessary and indeed it is unwise for all the teams to compete as hard as they can against each other in a business way. If all the teams should compete as hard as they can in a business way, the stronger teams would be likely to drive the weaker ones into financial failure. If this should happen not only would the weaker teams fail, but eventually the whole league, both the weaker and the stronger teams, would fail, because without a league no team can operate profitably.
>
> It is particularly true in the National Football League that the teams should not compete too strongly with each other in a business way. The evidence shows that in the National Football League less than half the clubs over a period of years are likely to be financially successful. There are always teams in the League which are close to financial failure. Under these circumstances it is both wise

and essential that rules be passed to help the weaker clubs in their competition with the stronger ones and to keep the League in fairly even balance.

*Id.* at 323. *See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462 (E.D.Pa.1972). The view that the production of professional sports requires joint decisions of the different teams in order to insure their continued existence has become widely recognized. 16F J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 50.01 (1982); R. Bork, *The Antitrust Paradox*, Ch. 17, at 332 & 337–38 (1978). The Second Circuit recently reaffirmed this view in *North American Soccer League v. National Football League*, 670 F.2d 1249 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 499 (1982). Although rejecting the NFL's position that there was no Section 1 "contract, combination ... or conspiracy" because they were a single entity, the court nevertheless recognized the need for joint activity:

> [T]he economic success of each franchise is dependent on the quality of sports competition throughout the league and the economic strength and stability of other league members. Damage to or losses by any league member can adversely affect the stability, success and operations of other members.... In view of this business interdependence team owners, through their leagues, invariably require that the sale of a franchise be approved by a majority of team owners rather than by the selling owner alone.

*Id.* at 1253. Because of the unique character of professional sports, then, courts have rejected the *per se* test and have routinely applied the Rule of Reason in deciding antitrust suits concerning league practices. *See, e.g., Brenner v. World Boxing Council*, 675 F.2d 445 (2d Cir.1982), *cert. denied* —— U.S. ——, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *North American Soccer League v. National Football League, supra;*

---

**20.** Group decisions by the NFL concerning the telecasting of their games is now covered by statute. *See* 15 U.S.C. §§ 1291–95 (1976).

*United States Trotting Association v. Chicago Downs Association,* 665 F.2d 781 (7th Cir.1981); *Neeld v. National Hockey League,* 594 F.2d 1297 (9th Cir.1979); *Smith v. Pro-Football, Inc.,* 593 F.2d 1173 (D.C.Cir. 1979); *Mackey v. National Football League,* 543 F.2d 606, 609 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

 The Rule of Reason test as enunciated in the landmark case of *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), mandates that a court determine whether the restraint imposed merely regulates and thereby promotes competition or is one that may suppress or destroy competition. In order to do this, the court:

> must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 244.[21] Crucial to proving an antitrust violation under the Rule of Reason is a showing of anticompetitive intent or effect. *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advertising Association,* 672 F.2d 1280 (7th Cir.1982); *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 892 & n. 17 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981).

In this regard, the case of *Levin v. National Basketball Association,* 385 F.Supp. 149 (S.D.N.Y.1974) is instructive.

In *Levin,* the plaintiffs were two businessmen who had an agreement to buy the Boston Celtics basketball team. Before this deal could be consummated, it had to be approved by three-fourths of the members of the National Basketball Association ("NBA"), a league comparable to the NFL. The NBA failed to approve the sale.

The reasons for the disapproval were disputed by the parties. Plaintiffs alleged they were rejected only because they were friendly with an obstreperous and disliked member of the NBA. Defendants on the other hand claimed that to permit the transfer would result in a violation of a conflict of interest provision of the NBA constitution. The court decided, however, that the reason for the disapproval was irrelevant because whatever the reason, it was not anticompetitive:

> Here the plaintiffs wanted to *join* with those unwilling to accept them, *not to compete with them,* but to be partners in the operation of a sports league for plaintiffs' profit. Further, no matter which reason one credits for the rejection, it was not an anti-competitive reason. Finally, regardless of the financial impact of this rejection upon plaintiffs, if any, the exclusion of the plaintiffs from membership in the league did not have an anti-competitive effect nor an effect upon the public interest.

*Id.* at 152 (footnote omitted) (emphasis in original). Because defendants' actions were not prompted by any anticompetitive intent

---

**21.** Plaintiffs ask that this court apply the test announced by the court in *Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049 (C.D.Cal.1971). That court viewed the *Silver* case as an exception to the finding of group boycotts as per se violations for reasonably self-regulated industries. The test requires: (1) that there exists a legislative mandate for self-regulation or otherwise; (2) the group action is intended (a) to reach a result consistent with the policy justifying self-regulation; (b) is reasonably related to that goal; and (c) is no more expansive than necessary; and (3) there are procedural safeguards assuring the restraint is not arbitrary and which provides a basis for judicial review. *Id.* at 1064–65. This test has not been applied by the Third Circuit. Thus I will use instead the traditional Rule of Reason test, this test having been recently reaffirmed by the Third Circuit in *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139 (3d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982).

or effect, the court granted summary judgment in defendants' favor.[22]

The reasoning in the *Levin* case is applicable to plaintiffs here. They do not want to compete with the NFL. They tried that and failed. Now they seek to join the asserted antitrust violaters and share all the advantages of an established organization. Plaintiffs try to eschew this obvious conclusion by emphasizing that a franchise's revenue does not come solely from jointly earned profits; some money is earned by individual promotion, for example, of team paraphernalia and from local broadcast revenues. This does not change the obvious fact that the ability to earn these individual profits is an indirect benefit of being a member of the league. A franchise's popularity is inextricably bound up with the quality of its competition on the playing field and the resulting excitement and sense of team loyalty. If the Mid-South Grizzlies played inept teams, their revenue generating potential would no doubt drop. Plaintiffs simply are not competitors of defendants who have been injured by any anticompetitive behavior of defendants.

In fact, were plaintiffs to prevail, the receipt of a franchise would be more anticompetitive than their failing to obtain one. Were plaintiffs' premise embraced by this court—that all acceptable applicants for franchises be given one—then motivation to form a rival league would be substantially dampened. *See* J. Weistart & C. Lowell, *The Law of Sports* § 5.11, at 751 (1979).

Moreover, defendants acted fairly and objectively in deciding to reject plaintiffs' application. They met with plaintiffs at least three times over the course of four months to hear plaintiffs out and to explain the reasons why neither plaintiffs' nor any other application would be considered on the merits.[23] Rozelle and the Expansion Committee arranged a meeting between plaintiffs and the entire league membership despite their own belief and recommendation that further expansion not be initiated at that time. Plaintiffs were thus afforded an opportunity to dissuade the membership from following the Committee's recommendation. Furthermore, Rozelle again reiterated the reasons for refusing plaintiffs' application in a letter dated December 29, 1975. Exhibit 3B, Motion of Defendants for Summary Judgment and Addenda. There is no evidence that plaintiffs were treated in a manner less favorably than any other party expressing an interest in obtaining a franchise.

The fact defendants failed to fully consider plaintiffs' application on its merits does not suggest a contrary result. Defendants had substantial business reasons to justify their decision not to plan any further expansion at the time of plaintiffs' application. They were in the middle of assimilating the first two new teams in several years each of which took three players from each existing team. Moreover, the NFL had several lawsuits against it which were creating a great deal of uncertainty as to the future of several NFL rules and

---

**22.** Two commentators on the law of sports have expressed the following view concerning the awarding of sports franchises:

> The admission practices of sports leagues present a different concern. An analysis of the relationship between clubs within a league suggests that the various league members do not compete with one another in an economic sense. Rather, a league is more like a partnership. While each club initially contributes its own capital, the various participants to a large extent share in the joint profits of the venture. This participation in profits is achieved through various arrangements, such as the pooling of television receipts and the division of gate receipts between home and visiting clubs. Thus, a decision on access to membership is basically a decision as to whether particular individuals (or their business entities) will be allowed to participate in the partnership venture. Since the various members pool their efforts and do not engage in economic competition with one another, an adverse decision on membership in the usual case has no appreciable impact on the level of competition which will take place.

J. Weistart & C. Lowell, *The Law of Sports* § 3.16, at 315 (1979) (footnotes omitted).

**23.** In addition Mr. Bassett testified that he met with Mr. Rozelle another three or four times as well as talked with him on the telephone on three or four occasions. Bassett Deposition, January 21, 1981, at 103.

policies. Given these factors, it was a business judgment that further expansion at that time would be foolhardy. Thus, an in depth inquiry into plaintiffs' application would have been a waste of defendants' and plaintiffs' time. To require such busywork for each application which was submitted to the defendants when it was already decided not to expand would simply be bad business.[24] It just does not make sense to pass judgment on a potential franchisee when no franchise is available and it would be equally as foolish to commit a future franchise to an entity which may not even be in existence or otherwise fail to qualify on the date the franchise becomes available.

■ Recognizing the irrelevance of their game plan plaintiffs try an end run based upon their allegation that the defendants' sole motivation for rejecting them as a franchisee was their past involvement with the WFL. *See* J. Weistart & C. Lowell, *supra* § 5.11, at 756–57. Plaintiffs fail, however, to muster any substantial evidence to support this assertion. Even where a state of mind is material in an antitrust case, there must be some demonstration that there is a sufficient quantum of evidence to permit a party to go to the jury. *White v. Hearst Corp.,* 669 F.2d 14, 17 (1st Cir.1982).

The only evidence to support plaintiffs' allegation comes from the testimony of Mr. Bassett. At his deposition Mr. Bassett stated that some people had expressed the *opinion* that his past WFL affiliation would hurt his chances at obtaining an NFL franchise.[25] Some of this is speculation and some is hearsay. This is hardly the kind of play upon which to rely for an antitrust score.[26] Of particular importance, however, is that Bassett admitted these views were personal to the speakers and did not represent the NFL's position. Bassett Deposition, January 21, 1981, at 111–21. Notably, Bassett did not testify that similar statements were voiced by Rozelle[27] or any member of the Expansion Committee, all of whom already had decided further expansion would be unwise and recommended this course to the NFL membership. It is clear that if any mind-set existed, it was against immediate expansion and not against plaintiffs as franchise applicants.

■ In plaintiffs' next series of downs they concentrate on the essential facility doctrine.[28] *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Plaintiffs' reliance on this doctrine is misplaced. The doctrine is applicable only where a party is being denied access to something necessary for that party to engage in business which is con-

---

**24.** Mr. Rozelle testified that he has received inquiries from twenty to thirty cities about obtaining an NFL franchise since he became Commissioner in 1960. It is not clear how many of these submitted a formal application. Rozelle Deposition, November 12, 1981, at 28.

**25.** These people are Mr. Lynn, then General Manager of the Minnesota Vikings; Mr. Robbey, the owner of the Miami Dolphins; Mr. Thomas, then General Manager of the Baltimore Colts; and possibly Mr. Finks of the Chicago Bears. In addition, Mr. Keating, an NFL player representative, and Mr. Czonka, a former NFL and WFL player, stated they had heard Mr. Robbey express disfavor of Mr. Bassett's WFL activities. Lastly, a Mr. Mix, a former player and player representative said he had heard similar thoughts expressed by some NFL people. Bassett Deposition, January 21, 1981, at 111–21.

**26.** Indeed, it seems to me that for this play to have any chance at all it should be made in the context of the Memphis franchise having been awarded to another applicant.

**27.** In fact Mr. Bassett testified Mr. Rozelle assured him his WFL past would not be held against him. Bassett Deposition, January 21, 1981, at 116 & 121.

**28.** The essential facility doctrine applies in the following situation: "[I]f a group of competitors, acting in concert, operate a common facility and if due to natural advantage, custom or restrictions of scale, it is not feasible for excluded competitors to duplicate the facility, the competitors who operate the facility must give access to the excluded competitors on reasonable non-discriminatory terms." L. Sullivan, *Handbook of the Law of Antitrust* § 48, at 131 (1977).

trolled by his *competitors.* The *Hecht* case is illustrative.

In *Hecht,* plaintiffs were a group of promoters who had tried and failed to obtain an AFL franchise in Washington, D.C.[29] The apparent reason for this failure was the plaintiffs' inability to procure a contract with the only stadium suitable for professional football play due to a clause in the contract the stadium owner had with the NFL franchisee in the area which prohibited the stadium being leased for use by any other professional football team. The *Hecht* court held that the trial court erred in failing to instruct the jury concerning the essential facility doctrine.

■ In *Hecht* it was clear that a competitor was being denied access to an essential facility by a rival team in a different league. Such is not the case here. As previously stated, plaintiffs wish to join with defendants not compete with them. Nor are the defendants denying the Mid-South Grizzlies access to any stadium. Moreover, it is not economically infeasible for plaintiffs to engage in professional football. *Hecht v. Pro-Football, Inc., supra,* at 992. Although not an easy task, plaintiffs are free to again attempt to form a rival football league.[30] Plaintiffs concede a history of a number of leagues appearing over the years. *See* Plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment at 4–9. The AFL proved the task of forming a rival league is not impossible. Indeed, a new football league, the United States Football League ("USFL"), is currently being organized and John Bassett, the chief executive officer of the plaintiff Mid-South Grizzlies partnership, is the owner of the Tampa franchise in that league.[31] *See The Philadelphia Inquirer,* May 16, 1982, Section E, at 1.[32]

■ For similar reasons, plaintiffs' reliance on several trade association cases is also inappropriate. *See, e.g., United States v. Realty Multi-List, Inc.,* 629 F.2d 1351 (5th Cir.1980). In such cases, the courts have required that the association's membership criteria be fair, reasonable and the least restrictive as possible. The philosophical foundation for this rule is stated in the *Realty* case:

> When a group of competitors like the membership of RML [the trade association] join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions. As Adam

---

**29.** Plaintiffs' attempt took place prior to the AFL's merger with the NFL in 1966.

**30.** In *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139 (3d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982), a manufacturer of bubble gum sued a rival bubble gum manufacturer and the Major League Baseball Players Association claiming the defendants had excluded effective competition in the sale of baseball cards because of their exclusive licensing contracts. The Third Circuit held that these contracts did not foreclose competition in part because Fleer could still compete for licensing contracts with minor league players which, in time, may become major league players. The fact this process may take several years to become profitable, the court found, did not make the defendants' agreements anticompetitive.

**31.** Judicial notice may be used in resolving a motion for summary judgment. 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2723 (1973).

**32.** Even were plaintiffs true competitors with defendants, I have serious doubts the essential facility doctrine would apply. The cases applying the doctrine involved the denial of access to physical structures or discreet services. *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (electrical transmission lines); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (direct telephone access to stock exchange for instantaneous communication); *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (railroad switching facilities); *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir. 1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (football stadium); *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976)(flour mill); *United States v. Standard Oil Co.,* 362 F.Supp. 1331 (N.D.Cal.1972), *aff'd,* 412 U.S. 924, 93 S.Ct. 2750, 37 L.Ed.2d 152 (1973) (fuel storage facilities). In contrast, plaintiffs seek to participate in an entire business organization. Thus, the principles enunciated in these cases seem inapposite.

Smith, the archangel of the free enterprise system, observed, "People of the same trade seldom meet, even for merriment or diversion, but the conversation ends in a conspiracy against the public. . . ."

*Id.* at 1370 (citation omitted). Because the potential harm to outsiders is so great when their competitors are brought together through a trade association, the law requires access to the group be available to anyone who meets fair criteria. *Id.* at 1371–72; *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

The evil that this rule is designed to thwart is absent in the case at bar. As stated earlier, the production of professional sports necessarily requires joint planning and decision making. Unlike normal business competitors, the teams are interdependent, *North American Soccer League v. National Football League,* 670 F.2d at 1251, and while the economic success of one team does not necessarily mean the success of another member, the stability which is derived from membership in a league produces a better product which is to the benefit of the public at large. They do not compete in the same manner as the independent businesses in these trade association cases. Thus, these cases are inapposite.

Based upon the undisputed material facts I conclude as a matter of law that a Section 1 violation has not been made out. Thus, plaintiffs are scoreless at halftime.

*The Second Half*

Finding no Section 1 violation is not the end of the ball game. Plaintiffs also assert that defendants' behavior constitutes an unlawful act of monopolization proscribed by Section 2 of the Sherman Act. This effort also fails to penetrate the NFL's defensive line.

There is no doubt that the NFL currently has a monopoly in the United States in major league football.[33] However, the possession of monopoly power in a relevant market alone is not enough to establish an antitrust violation. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). The antitrust laws were not intended to punish a business that has become a monopoly because of a "superior product, business acumen, or historic accident." *United States v. Grinnell,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966).[34] The law does require that a monopoly not abuse its power. Thus where a business possessing monopoly power wilfully acquires or maintains such power, it will incur a penalty. *Id.* To avoid a Section 2 violation, then, a monopoly must "refrain at all times from conduct directed at smothering competition." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d at 275. Put another way, a monopoly abuses its power when it behaves in an "unreasonably exclusionary manner vis-a-vis rivals or potential rivals. . . ." *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 853 (6th Cir.1979); *Borden, Inc. v. Federal Trade Commission,* 674 F.2d 498, 513 (6th Cir.1982).

Once again plaintiffs fail to get the necessary yardage. Plaintiffs simply are not rivals or potential rivals of defendants except on the playing field. Moreover, despite plaintiffs' failure to obtain a franchise, they are still free to promote a rival league. The actions plaintiffs complain of here have done nothing to prevent the formation of a rival league or the fielding of a team in Memphis, Tennessee. Thus, no

**33.** Judge Learned Hand in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945), found a 90% share of a relevant market conclusive evidence of monopoly power. Plaintiffs allege that the relevant product market is major league professional football; the relevant geographic market is the United States, with a submarket in the "Mid-South" area comprised of Tennessee, Mississippi and Arkansas. Defendants do not dispute these contentions and I find them to be acceptable.

**34.** Judge Hand phrased it in this manner: "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Co. of America,* 148 F.2d at 430.

Section 2 violation has been shown as a matter of law. Plaintiffs fail to score again and the time has run out on the clock. Defendants win.

*Post Game Analysis*

I do not hold that the NFL and its members cannot be guilty of anticompetitive behavior but only that the denial upon demand of a new National Football League franchise to a qualified person does not run afoul of the antitrust laws.

Defendants are entitled to summary judgment on plaintiffs' claims under both Sections 1 and 2 of the Sherman Act.