Jeremiah DRISCOLL and Thomas P. Dowd, Plaintiffs,

v.

CITY OF NEW YORK, Circle Line Sightseeing Yachts, Inc., Michael Huerta as Commissioner of the Department of Ports and Terminals and Francis J. Barry, Defendants.

No. 82 Civ. 8497 (JFK).

United States District Court, S.D. New York.

Jan. 12, 1987.

Berger, Poppe, Janiec & Graziadei, New York City, for plaintiffs; John J. Janiec, of counsel.

Frederick A.O. Schwarz, Jr., Corp. Counsel, New York City, defendants City of New York, and Michael Huerta; Christopher R. Gette, Asst. Corp. Counsel, of counsel.

McHugh & O'Conor, New York City, for defendants Circle Line Sightseeing Yachts,

Inc. and Francis J. Barry; Martin J. McHugh, William A. Sullivan, of counsel.

KEENAN, District Judge:

Plaintiffs Jeremiah T. Driscoll and Thomas P. Dowd have filed suit against the City of New York, a Commissioner of the City of New York, a company operating a tourist excursion boat business in New York City, Circle Line Sightseeing Yachts, Inc. ("Circle Line"), and Francis J. Barry, an individual serving as chairman of the board of directors of Circle Line, alleging that they conspired to monopolize the tourist excursion boat business in the City of New York.[1] Defendants City of New York and the Commissioner of Ports and Terminals (together, "the Municipal Defendants") have moved for summary judgment. They assert that no genuine issues of material fact are in dispute, and that they are entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("FRCP") 56. The remaining defendants, Circle Line and Barry (together, "the Private Defendants") join the motion for summary judgment by submitting a supplemental memo in support of the Municipal Defendants' motion. Plaintiffs assert that genuine issues of material fact do exist, so as to make summary judgment inappropriate.

## FACTS

Plaintiffs have sued for violations of Sections 4, 7, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 18 and 26, and under Section 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2 and 3. These statutory sections shall be referred to herein as the "antitrust laws." Plaintiffs also seek relief under the New York General Business Law, § 340, alleging violations of the state antitrust law, and for malicious interference with their operation. The first, third and fifth causes of action in the complaint are directed against the Municipal Defendants.

---

1. Plaintiffs originally brought suit against Linda Seale, then Commissioner of the Department of Ports and Terminals. She has been succeeded in that position, and in this action, by Susan Frank, and again by Michael Huerta, subsequent Commissioners of the Department. Francis J. Barry is recently deceased.

In the first claim, plaintiffs allege that the pier facility between West 36th Street and West 47th Street, on or about 12th Avenue in New York, New York ("the pier facility") constitutes an "essential facility" under the antitrust laws. Plaintiffs allege that the Municipal Defendants have leased two piers, numbered 83 and 81, both part of the pier facility, to Circle Line, under an exclusive agreement for twenty year terms which began in 1961 and 1965, respectively. Each of the two leases is alleged to have "three successive renewal periods of ten years each." (Complaint ¶¶ 11, 12). Plaintiffs further assert that the pier facility in its entirety is the subject of a restrictive covenant, contained in paragraph 37 of the 1965 lease agreement between the Municipal Defendants and the Circle Line.

By the terms of Paragraph 37, plaintiffs assert, the "operation of passenger vessels for excursion or sightseeing purposes" is prohibited, except for operations of Circle Line. This prohibition is alleged to constitute a bar on all competitive business in the tourist boat business in New York City. (Complaint ¶ 13). According to plaintiffs, the restriction on use of the essential facility of the piers between West 36th Street and West 47th Streets has allowed Circle Line to maintain a monopoly in the passenger excursion boat business (Complaint ¶ 16); has foreclosed plaintiffs in particular from operating a competing business, despite their qualifications to do so (Complaint ¶¶ 17–23); and has caused plaintiffs to suffer loss of revenues. (Complaint ¶ 24). Defendants have previously moved for summary judgment, alleging that plaintiffs lacked standing to bring the suit as a consequence of their failure to adduce a genuine issue of material fact with respect to their preparedness to enter the sightseeing business. This motion was denied in a memorandum endorsement of Judge Leonard B. Sand of this Court. *See Driscoll v. City of New York,* 82 Civ. 8497 (LBS) slip op. (S.D.N.Y. August 10, 1983).

The second cause of action alleges that Circle Line engaged in an attempt to monopolize, and has monopolized the passenger boat business in New York City. The third claim proceeds against all defendants.

In it, plaintiffs assert that all defendants engaged in an unlawful combination and conspiracy to restrain trade and to monopolize. The fourth cause of action is directed against the Private Defendants, only. It asserts that Barry and Circle Line employed unfair and unlawful predatory means to impair competition on the entire pier facility. The fifth cause of action, alleging violation of § 340 of the General Business Law, is asserted against all the defendants.

The Municipal Defendants move for summary judgment on the first, third and fifth claims, in which they are named. As to the first claim, they argue that the lease of a municipal pier constitutes "state action" which is not subject to scrutiny under the antitrust laws. Specifically, they urge that in entering into leases for City piers, the City was exercising powers delegated to it by the State of New York, and thus the City can invoke the state's defense first articulated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In addition, the Municipal Defendants assert that the pier facility does not constitute an "essential facility", and that a requisite element of antitrust violation under the Sherman Act is thereby lacking. They move for dismissal of the first cause of action.

The Municipal Defendants next argue that plaintiffs fail to allege specific facts to support the claim that the restrictive covenant in Paragraph 37 of the lease agreement was the consequence of a conspiracy to monopolize, as opposed to a desire simply to re-develop the city's waterfront. Thus, they assert, the second cause of action, and impliedly the third cause of action, should be dismissed, as well.

The Municipal Defendants also urge that the entire complaint is barred by the statute of limitations. The four year statute of limitations for antitrust actions, set forth at 15 U.S.C. § 15b allegedly bars the entire action, based on the date of inception of the alleged conspiracy as calculated by the Municipal Defendants.

Finally, the Municipal Defendants assert that the state statutory and common law claims against them should be dismissed, as a function of the doctrine of pendent jurisdiction, and on substantive grounds of failure to state a cause of action under state, as well as federal antitrust law.

In response, plaintiffs deny that the activities of the Municipal Defendants in leasing the pier facility to the Private Defendants are exempt from antitrust evaluation. They also argue that the complaint was timely commenced, and is not barred by the statute of limitations. Ultimately, the plaintiffs attempt to refute each of the defendants' assertions.

## DISCUSSION

### I. State Action Doctrine

The Court will begin its analysis with the question of whether the Municipal Defendants and the Private Defendants are immune from the antitrust laws, as they assert. The defendants as a group allege that they are exempt from scrutiny under the antitrust laws by virtue of the "state action" doctrine, first set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), in which the Supreme Court "refused to construe the Sherman Act as applying to the anticompetitive conduct of a State acting through its legislature." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

The "state doctrine" area of antitrust law has developed through accretion and fine-tuning of a large body of Supreme Court case law following *Parker*. Most conveniently, the Court of Appeals for the Second Circuit in a recent decision comprehensively reviewed and summarized the state of the doctrine in *Cine 42nd Street Theater Corp. v. The Nederlander Organization Inc.*, 790 F.2d 1032 (2d Cir.1986). The Second Circuit review of all the relevant case law follows:

(1) When a state acts in its sovereign capacity, its actions are immune from federal antitrust scrutiny. *Parker*, 317 U.S. at 351–52 [63 S.Ct. at 313–14]; *see* Areeda, *Antitrust Immunity, supra*, at 436–37. State legislatures and courts are accorded such status. *See Hoover*, 104 S.Ct. at 1996–98 (adjunct committee to state supreme court); *Bates*, 433 U.S. at 359–63, [97 S.Ct. at 2696–98] (state's highest court when exercising its judicial authority acts as the state); *Parker*, 317 U.S. at 351–52 [63 S.Ct. at 313–14] (state legislature).

(2) Although municipalities are state subdivisions, they do not enjoy the deference due a state as sovereign and cannot create their own policies. A municipality will be immune from antitrust liability only if it acts as an instrumentality of the state, through which the state has clearly and affirmatively chosen to implement its policies. *Community Communications Co.*, 455 U.S. at 52–54 [102 S.Ct. at 84–42]; *Lafayette*, 435 U.S. at 411–13 [98 S.Ct. at 1136].

(3) When a state agency, municipality, or other state subdivision claims a state immunity from federal law, it must first identify a "clearly expressed state policy" that authorizes its actions. *Hallie*, 105 S.Ct. at 1717. The clarity of such policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernible in narrowly drawn legislation. The legislation must contain an affirmative showing of intent, though it need do no more than authorize the challenged conduct. *Southern Motor Carriers*, 105 S.Ct. at 1729.

(4) So long as the resulting anticompetitive activities are a foreseeable consequence of the state delegation, the "clear articulation" standard has been met. *Hallie*, 105 S.Ct. at 1718–19. To meet this requirement the party claiming the state action defense must show that the "legislature contemplated the action complained of." *Id.* (*quoting Lafayette*, 435 U.S. at 415 [98 S.Ct. at 1138]).

(5) The second requirement—"active state supervision"—is no longer required in the case of a municipality, because a municipality, unlike a private party, has no incentive to act other than in the public interest. *Hallie*, 105 S.Ct. at

1720. When the challenged actor is a private party, both foreseeability and supervision must be demonstrated. *Southern Motor Carriers*, 105 S.Ct. at 1729.[2] *Cine 42nd Street*, 790 F.2d at 1042–43.

In addition to organizing prior case law, the *Cine 42nd Street* court determined that the "state action doctrine is generally available to parties defending a § 7 Clayton Act violation," as well as a Sherman Act violation. *Cine 42nd Street* at 1040. Thus, this Court, should it determine that the state action defense applies, would find the relevant defendants immune from the Clayton Act charges, in addition to the Sherman Act charges.

The Court will proceed through the state action defense analysis. In the case at bar, both Municipal Defendants will be immune only if acting "as an instrumentality of the state, through which the state has clearly and affirmatively chosen to implement its policies." *Cine 42nd Street*, 790 F.2d at 1042–43 (citing *Community Communications*, 455 U.S. at 52–54, 102 S.Ct. at 841–42; *Lafayette*, 435 U.S. at 411–13, 98 S.Ct. at 1136). Defendants identify the state statute found at General City Laws § 20(8) as the expression of state policy creating immunity. This statute reads:

> Subject to the constitution and general laws of this state, every city is empowered:
>
> \*   \*   \*   \*   \*   \*
>
> 8. To control and administer for any business, commercial, maritime or public purpose the waterfront and waterways of the city and to establish, maintain, operate and regulate for any such purpose or purposes docks, piers, wharves, warehouses and all adjuncts and facilities

for the utilization of the waterfront and waterways and adjacent property.[3]

██ The Municipal Defendants assert that the above statute ("the statute") indicates the legislature's "clearly articulated" intent to empower the City to, among other things, lease piers and as a related power, "to include in those leases a provision such as a restrictive covenant." (Municipal Defendants' Memo of Law, p. 6). The Court is not convinced. While recognizing that "the enabling legislation need not explicitly authorize the exact actions undertaken," it is not evident to the Court that "the permitted actions produce anticompetitive consequences that foreseeably flow from the grant of state authority." *Cine 42nd Street*, 790 F.2d at 1043. The Second Circuit formulated the issue in the abstract, as follows:

> the enabling statute must affirmatively designate a particular area to be regulated, provide the methods of regulation, and create grounds for the reasoned belief that some anticompetitive activity could be envisioned.

*Cine 42nd Street*, 790 F.2d at 1043–44.

General City Law § 20(8) is too broad to satisfy this formulation. As the Second Circuit held, interpreting *Southern Motor Carriers*, "[t]he clarity of such policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernible in narrowly drawn legislation." *Cine 42nd Street*, 790 F.2d at 1043. Because of the breadth of the regulatory authority conferred on cities with respect to waterfront operation and regulation by the statute, no

---

**2.** The complete citations for the above-referenced cases and articles are, in the order in which they appear in the body of the text: *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435 (1981); *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Parker supra*; *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Lafayette v. Louisiana Power & Light Co.*, 435 U.S.

389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Southern Motor Carriers Rate Conference v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985); *Hallie, supra; id.; Southern Motor, supra.*

**3.** This statute read slightly differently at the time the leases at issue were entered into. The following analysis would apply with equal force to the prior wording of the statute.

state action defense exists for the Municipal Defendants.

Applying the Second Circuit's formulation step by step, the Court first notes that the enabling statute does "affirmatively designate a particular area to be regulated," which is, obviously, that of regulation of waterfront and waterways. However, the statute does not "provide the methods of regulation," as did, for example, the statute at issue in *Cine 42nd Street*, itself. That statute empowered the state-created Urban Development corporation to "acquire ... by grant, purchase, condemnation or otherwise, lease-holds, real, personal or mixed property or any interest therein; to own, hold, clear, improve and rehabilitate, and to sell, assign, exchange, transfer, convey, lease, mortgage, or otherwise dispose of or encumber the same." *Cine 42nd Street*, 790 F.2d at 1045. As the Court of Appeals stated, "[t]hese and other specific powers show that the UDC would lease property in an anticompetitive manner." *Id.* No similar, specific "methods of regulation" are incorporated into the statute concerning the Municipal Defendants herein.

Moreover, the third part of the three-part test as formulated by the Second Circuit is not satisfied either. This Court does not find that the statute creates grounds for "the reasoned belief that some anticompetitive activity could be envisioned." Unlike the *Cine 42nd Street* statute, which specifically articulated the goals of the UDC as including urban renewal, including the provision of various kinds of facilities, "and the encouragement of participation in these programs by private enterprise," U.D.C. Act § 6252, and the grant to UDC of the power to enter in a 99–year lease with any third-party, § 20(8) does not create any grounds for the expectation that anticompetitive activities would ensue. The Court is hard-pressed to see how the general terms of the statute "surely contemplated" that anti-competitive consequences would arise from waterfront regulation. The Court determines that the "clear articulation" standard has not been met, and that the Municipal Defendants are not entitled to invoke the state doctrine defense on the

basis of the statute. Moreover, since foreseeability is absent, the Private Defendants fail to meet even the first of the two requirements for invoking the doctrine on their behalf. In addition, it is obvious that the "supervision by the state" which is required before private parties may claim protection from antitrust scrutiny under *Southern Motors Carriers* is also lacking. The Municipal Defendants and the Private Defendants are not immune from the antitrust laws.

## II. Statute of Limitations

Federal antitrust actions are governed by a four year statute of limitations. 15 U.S.C. § 15b. Such actions are barred if not commenced within four years of the time at which they accrued. Generally, accrual of antitrust causes of action takes place when defendant commits an act which injures plaintiff's business. As the Supreme Court has stated, "(i)n the context of a conspiracy to violate the antitrust laws ... this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues. *Zenith Radio Corporation v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). The Court further noted that, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* at 339, 91 S.Ct. at 806. Thus, in *Zenith*, the Court expanded on the notion it had previously set forth in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502 n. 15, 88 S.Ct. 2224, 2236 n. 15, 20 L.Ed.2d 1231 (1968). In *Hanover*, the Court held that although an illegal policy first affected the plaintiff in 1912, a suit instituted in 1955 was not barred by the statute of limitations because the policy was "conduct which constituted a continuing violation of the Sherman Act ... [and] inflicted continuing and accumulating harm on [the plaintiff]." *See id.* Taken together, these

two cases stand for the proposition that any act within the limitation period which causes an antitrust injury pursuant to the challenged agreement gives rise to an action for damages. *See National Souvenir Center v. Historic Figures, Inc.*, 728 F.2d 503, 509 (D.C.Cir.), *cert. denied*, 469 U.S. 825, 105 S.Ct. 103, 83 L.Ed.2d 48 (1984). *See also Andrea Theatres Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 65 (2d Cir. 1986) ("[plaintiff's] claim need not be based solely upon the execution of a contract, but may also seek relief for subsequent injuries incurred within the four year period, even though the harm stemmed from performance of the contract").

■ In this case, it is apparent that a cause of action accrued in plaintiffs' favor in 1982, at the time their application for docking privileges at the pier facility was denied. Although the defendants assert that this denial was merely a reaffirmation of a decision taken in 1965—the inclusion of the restrictive covenant in the lease on pier 81—the denial was taken pursuant to the agreement at the heart of the lawsuit, and allegedly resulted in antitrust injury to plaintiff. This is precisely the situation contemplated by *Zenith*, *Hanover* and its progeny. For this reason, defendants' motion to dismiss on the basis that the statute of limitations has run against plaintiffs must be denied.

### III. Section 1: The "Essential Facility" Doctrine

The primary method of analysis under the antitrust laws is the rule of reason. *See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 7–8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). Simply stated, the rule weighs the benefits and harms the challenged arrangement has on competitive conditions in the relevant market. *See Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Because certain practices and agreements are so "plainly anti-competitive," *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), and "lack ... any redeeming virtue," *Northern Pac. R.*

*Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), they are "conclusively presumed illegal without further examination under the rule of reason." *Broadcast Music*, 441 U.S. at 8, 99 S.Ct. at 1556. One such arrangement involves the use of a so-called "essential facility." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Hecht v. Pro-Football Inc.*, 570 F.2d 982 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

As a factual matter, the Municipal Defendants contend that the pier facility is not essential either in terms of location or function, such that its control by defendants impairs competition in the boat excursion business in New York City. They assert that plaintiffs conceded relevant facts such that consequently, defendants are entitled to judgment as a matter of law under the doctrine of essential facility. For the reasons set forth below, the Court concludes that the pier is not an essential facility, and hence, per se liability cannot attach. However, because the Court lacks sufficient information concerning the relevant market, it cannot conclude that the restrictive covenant is reasonable as a matter of law. Therefore, summary judgment is inappropriate on plaintiffs' claim under section 1.

The essential facility doctrine has been described as existing where:

> ... a group of competitors, acting in concert, operate a facility and if due to natural advantage, custom or restrictions of scale, it is not feasible for excluded competitors to duplicate the facility, the competitors who operate the facility must give access to the excluded competitors on reasonable non-discriminatory terms.

L. Sullivan, *Handbook of the Law of Antitrust* § 48, at 131 (1977).

The doctrine would appear to be applicable to the instant case, since plaintiffs are potential competitors of the Private Defendants, and since it is their alleged exclusion from a particular facility to which plaintiffs object.

As a district court has stated, "[t]he doctrine is applicable only where a party is being denied access to something necessary for that party to engage in business which is controlled by his competitors." *Mid-South Grizzlies v. National Football League,* 550 F.Supp. 558, 570 (E.D.Pa. 1982), *aff'd,* 720 F.2d 772 (3d Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). Generally, the doctrine has aided plaintiffs in proving section 1 cases under the Act where there has been "denial of access to physical structures or discreet [sic] services." *Grizzlies,* 550 F.Supp. at 570, n. 32. For example, in *Otter Tail Power Co. v. United States,* 331 F.Supp. 54, 59–61 (D.Minn.1971), *aff'd,* 410 U.S. 366, 377–78, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973), it was determined that electrical transmission lines were a "scarce facility," and that the party's refusal to share them gave it substantial effective control over potential competition." 331 F.Supp. at 61. Similarly, in *Helix Mining Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317, 1320 (9th Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976), the same "bottleneck" principle was found to apply. The Ninth Circuit held that plaintiff stated a cause of action under section 1 since, "in a closed market, where the acquisition of existing production facilities is the only economically feasible method of entry, an agreement to acquire the only available facilities necessarily excludes a potential entrant."

A further, detailed description of the doctrine appeared in *Hecht v. Pro-Football Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). While the circuit court in *Hecht* held that the trial court below had erred in not instructing the jury regarding the essential facility doctrine, it noted that the doctrine must be "carefully delimited." *Id.* at 992. As articulated by the *Hecht* court,

to be "essential", a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible and if denial of its use inflicts a severe handicap on potential market entrants.... [T]he antitrust laws do not require that an essential facility be shared if such showing would be unpractical or would inhibit the defendant's ability to serve its customers adequately.

*Hecht,* 570 F.2d at 992–93.

■ On the facts before it, the Court finds that the pier facility is not "indispensible," that a duplication of the pier facility would be "economically feasible," and that plaintiffs are not "severely handicapped," by lack of access to the pier facility. This finding is premised on the recent discussion of the relative burdens placed upon parties to a motion for summary judgment, made by the Supreme Court in *Celotex v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court there held that the burden on a party seeking summary judgment is simply to "show," by "pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Id.* 106 S.Ct. at 2554. The Court ruled that the movant should not be required "to produce evidence" in making such a showing. Rather,

[I]n cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."

*Id.* at 2553.

As will be seen below, the Municipal Defendants have met this burden of "showing" the absence of genuine issues of material fact as to the non-existence of an essential facility.

The burden thus is shifted to plaintiffs, the nonmoving parties, to support their case on the challenge of the motion. The requirements of the burden on the nonmovants is heavier than that on the movant, according to *Celotex.* There, the Supreme Court stated that the nonmoving party was

require[d] ... to go beyond the pleadings and by [their] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial."

*Id.* The Court continued, delineating the burden by stating that "[w]e do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment," but could oppose with "any of the kinds of evidentiary materials listed in Rule 56(e), except the pleadings themselves." *Id.* at 2553–54. The Court determines that plaintiffs have not met this heavier burden.

Defendants point out that other tourist boat excursion businesses operate along the 578 miles of waterfront which surround New York City, a fact which plaintiffs cannot, and do not refute. (Schanback Aff., ¶¶ 33–35). A study by the New York State Department of Commerce, Division of Economic Research and Statistics, entitled "An Analysis of Development Potentials for Piers 84 and 86," dated December 5, 1979 indicates that approximately 1.5 million tourists to New York, or residents of the city, visited the Statue of Liberty, accessible only by Ferry, in 1978. (Schanback Aff., Ex. E). The same study shows that the South Street Seaport, in the same year, attracted about one million visitors. In addition, the 1979 study suggests that tourists visit attractions throughout New York City, without any reference to location in midtown. The Court takes judicial notice of the fact that excursion boats operate from Battery Park and South Ferry ("the Petrel"), from Pier 13 at Fulton and South Streets ("the Pioneer"), from Pier 11 at Battery Park ("the Ventura") and from East 23rd Street and in Greenwich Village. (Schanback Aff., ¶ 35–36). Floating restaurants, in addition, are located at spots around lower Manhattan and Brooklyn. (Schanback Aff., at ¶ 35). Thus, the factual contention of defendants, that tour boat businesses can and do operate profitably at locations other than the pier facility, has been shown. Moreover, defendants have pointed out to the Court that plaintiffs are not "severely handicapped" by lack of ac-

cess to the pier facility, and that it is "economically feasible" to operate in this industry without access to the pier facility. Defendants do this by relying on the statements of the plaintiffs. For example, at his deposition, plaintiff Dowd stated that,

[n]obody picks an area to go around Manhattan Island because of the area. They go where the boats are, the people are and they know it is 42nd Street. They don't come to Battery Park for the boats.

(Schanback Aff., Ex. G, p. 424). Dowd stated, in the course of the same deposition, that passengers might go to locations other than midtown, "because the tourists flock to midtown Manhattan," but this assertion does not suggest that tourists are absent from all other piers in Manhattan, a point which defendants have already established to the Court's satisfaction.

Plaintiff Driscoll, in his deposition, stated that the pier facility was the "choice location," that it had proximity to the "greatest amount of people", and that it had parking, all of which made it a more desirable location than others in the city. (Schanback Aff., Ex. C, pp. 599–600). Nowhere, however, did he articulate that it would be "infeasible" to duplicate the midtown pier facility elsewhere. His strongest statement, as plaintiffs assert, is that "[s]imply put, the Pier Facility ... is the Mecca." (Graziadei Aff., ¶ 12).

Driscoll has written a book, entitled *Crime Circles Manhattan*, in which he discusses much of the material which comprises the instant lawsuit. In deposition, Driscoll endorsed the facts included in his book, stating that they were and continue to be true. (Schanback Aff., Ex. C, p. 277). Among the statements in the book is the following:

The elimination of mid-town docking facilities was a crippling blow to the tourist industry but the business itself was and is economically viable. Potential competitors sought to start new operations from piers away from midtown.

(Schanback Aff., Ex. D, p. 113). Thus, Driscoll himself has stated that piers other than those in midtown are suitable for op-

erations. Similarly, at page 106 of the book, Driscoll stated that "[b]ecause of the rundown condition of all the city piers, there are very few still suitable.... Pier 11 is among the very few still suitable." Driscoll again admits that at least one pier, other than the subject pier facility, would be suitable for business. Finally, the Court notes that Driscoll admits that he operated his own excursion boat business from Battery Park and Pier 11 from 1948 to 1969, and that such business was profitable. (Schanback Aff., Ex. C, p. 621–626). The business was eventually closed, according to Driscoll, because "there wasn't much there to enthuse me," and that, although he could make "10 cents" at the Battery piers, he didn't "want ten cents when there is a dollar and when I waited for these years and have a position to have a chance to go back to my old love on 42nd Street." (Schanback Aff., Ex. C, pp. 624–35). Driscoll himself has admitted that a profit of some degree could be earned outside of the pier facility, and is himself proof of the fact that a business can operate successfully outside of the facility. It is a preference, rather than a necessity, to utilize the pier facility, which appears to be at issue in this lawsuit.

Defendants having "shown" the Court that no genuine issue of material fact as to the essentialness of the pier facility exists, the burden is shifted to the plaintiffs to refute the argument that no genuine issue of fact remains to be tried on the question of whether the pier facility is essential. Plaintiffs attempt to do this by asserting, for example, that

> As an expert in this field, I am not alone in believing that this area is essential to the operation of a passenger boat for sightseeing or excursion purposes.... The West side of Manhattan has the tourist trade, the parking facilities, and ready access to transportation facilities which are not available at other docking areas. The Pier Facility (specifically Piers 81 and 83) were constructed and cannot be realistically or practically duplicated by competitors elsewhere.

(Driscoll Aff., ¶ 23). This statement does not raise genuine issues of material fact, however. It simply suggests, in a conclusory fashion, that it would be costly to duplicate the pier facility. In opposing a motion for summary judgment, "it is incumbent upon a defending party to set forth 'supporting arguments or facts in opposition to the motion.'" *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), (quoting *SEC v. Research Automation*, 585 F.2d 31, 33 (2d Cir.1978)). Driscoll merely asserts that he would be unable to duplicate the pier facility—he does not designate "specific facts" supporting the infeasibility of duplication. No facts concerning, for example, the location of parking facilities throughout Manhattan, the absence of tourists in lower Manhattan, or inaccessibility of sites other than midtown by public transportation are offered, nor are facts which tend to show that these three factors would have any bearing on the profitability of a tour business located outside the area of the pier facility. Plaintiffs fail, with their conclusory allegations, to set forth "facts" which oppose defendants' claim that the pier facility is not essential. Furthermore, plaintiffs' Rule 3(g) Statement is equally conclusory. Plaintiffs have not met the requirements of *Eastway, or Celotex*. The Court determines that no genuine issue of material fact exists as to whether the pier facility constitutes an "essential facility" that could result in a per se violation of section 1. The Court finds, as a matter of law, that the pier facility is not an essential facility.

> As the D.C. Circuit stated in *Hecht*,
> The garden variety restrictive covenant does not violate § 1 unless it unreasonably restrains trade; when the restrictive covenant covers an essential facility, however, all possible competition is by definition excluded and the restraint is thus unreasonable *per se.*

*Hecht*, 570 F.2d at 993, n. 45. Since this Court finds that the pier facility did not constitute a "bottleneck", or essential facility, and that competition was not completely restrained by virtue of inaccessibility to the pier facility, there has been no *per se*

restraint of trade by defendants joining in the restrictive covenant.

█ The finding that there was no per se violation of section 1 of the Sherman Act does not, however, dispose of the section 1 claim. Section 1 prohibits all agreements "in restraint of trade." Thus, the statute would prohibit all business agreements if read literally because every contract restrains trade to some extent. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). Recognizing that Congress did not intend to eliminate all commercial agreements, the Supreme Court has adopted the rule of reason as the analytic framework for most business arrangements under section 1. *See Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977); *Standard Oil v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Thus, despite this Court's finding that the pier is not an essential facility, the restrictive covenant might still be found to be unreasonable. The inquiry under this analysis "is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). A restraint may be "unreasonable" if "surrounding circumstances giv[e] rise to the inference or presumption that [it] was intended to restrain trade and enhance prices." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978). Pursuing the analysis of the rule, the Court has stated that "competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. For a proper rule of reason analysis to occur, evidence must be presented defining the relevant product and geographic markets. In addition, facts must be presented on the restraint's impact on competitive conditions in the relevant market. *See Society of Professional Engineers*, 435 U.S. at 688–92, 98 S.Ct. at 1363–65. This is necessary to enable the fact finder to make a "thorough investigation of the industry under review and a balancing of the arrangement's positive and negative effects on competition." *See* T. Vakerics, Antitrust Basics, § 1.03[2] (1985). It is, therefore, premature for the Court to decide the reasonableness of the restrictive covenant. The defendants' summary judgment motion is denied as to the first cause of action.

## IV. The Section 2 Claims

In addition to their allegations under section 1 of the Sherman Act, plaintiffs assert that the defendants violated section 2 of the Sherman Act. The complaint states that the defendants have conspired and attempted to monopolize the excursion and sightseeing business in New York City. Complaint ¶ 32. It is further alleged that the Private Defendants did in fact have such a monopoly. *See id.* While this Court recognizes that summary judgment is certainly appropriate in some antitrust cases, *see Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir.1986), an examination of the elements in each section 2 claim, as well as the parties' assertions, reveals that summary judgment cannot be granted in this case.

### A. Actual Monopolization

█ The offense of actual monopolization under section 2 contains two elements: the possession of monopoly power and the willful acquisition or maintenance of monopoly power, as opposed to the acquisition or maintenance of such power through superior products, business skills or historical accident. *See United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The willfulness element of the offense has been interpreted as requiring some kind of bad, or anticompetitive conduct. *See Berkey Photo, Inc. v. Eastman Kodak, Co.*, 603 F.2d 263, 273–75

(2d Cir.1979); *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Implicit in the notion of monopoly power is the existence of a relevant product market. *See Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.,* 614 F.2d 832 (2d Cir.1980). As the Second Circuit has stated, "[t]he key to analysis, it must be stressed, is the concept of market power." *See Berkey Photo, Inc.,* 603 F.2d at 274. Plaintiffs' actual monopolization claim cannot be disposed of on this summary judgment motion because genuine issues of material fact remain concerning the relevant market. While the complaint speaks vaguely of the excursion and sightseeing business in New York City, it is unclear whether or not this is the proper market to be considered. For instance, it is possible that the market could be defined as the tourist industry in New York, of which the excursion boat business could be a proper sub-market. The defendants, however, have not shown the absence of a genuine issue of material fact concerning the relevant market.

In addition, genuine issues of material fact remain concerning the allegedly anticompetitive conduct engaged in by the defendants. Defendants assert that the restrictive covenant at issue was entered into in order to prevent "hawkers" from preying on customers to the pier facility. They allege that there are few documents or witnesses available to explain the presence of the covenant. (Schanback Aff., ¶ 20). The defendants state that "the City did not have the manpower to police hawkers, but could effectively ameliorate the hawking problem by simply prohibiting competitors from the area of Circle Line's operation." (Schanback Aff., ¶ 22). According to the defendants, the restrictive covenant was entered into solely in response to concerns about the "decaying waterfront." (Schanback Aff., ¶ 24).

The plaintiffs respond that the defendant Barry, while operating Circle Line, used undue influence to elicit the offending paragraph from the Board of Estimate. For example, it is indicated that Barry was appointed to the New York City Port and Development Committee at approximately the time the restrictive covenant became part of the lease. (Driscoll Aff., at ¶ 13). In addition, the construction of Pier 81 was financed by the City, and the plaintiffs assert that this suggests complicity in the leasing operation. (Driscoll Aff., ¶¶ 15–16). While the Court is obviously not making a finding that these assertions and innuendos by the plaintiffs are true, it cannot find that no genuine issue of material fact exists. For example, it is unclear whether the position Barry was appointed to was a paid position. Further, it is unclear whether there was competitive bidding for the pier facilities. These questions go to the anticompetitive nature of the defendant's conduct.

### B. Attempt to Monopolize

■ The offense of attempted monopolization also contains two elements: "(1) a 'dangerous probability of success' in monopolizing a given product market and (2) a specific intent to 'destroy competition or build monopoly.'" *Nifty Foods,* 614 F.2d at 841. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951). A defendant's specific intent to monopolize may be inferred from the defendant's conduct. *See Times-Picayune, supra.* The dangerous probability element requires an examination of the relevant market and the defendant's market shares. The defendants here have failed to show that no genuine questions of material fact exist on this issue, and thus the motion must be denied as to the attempted monopolization claim.

### C. Conspiracy to Monopolize

While the section 2 counts discussed above require proof of market share, this element is not present in a conspiracy to monopolize claim. The focus of this claim "is not the power, but the specific intent, to monopolize." *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir.1961). *See Bowen v. New York News, Inc.,* 522 F.2d 1242, 1258 (2d Cir.

1975), *cert. denied,* 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). As the Supreme Court has noted, "a conspiracy to monopolize violates Section 2 even though monopoly power was never acquired." *United States v. Griffith,* 334 U.S. 100, 106 n. 9, 68 S.Ct. 941, 945 n. 9, 92 L.Ed. 1236 (1948). Thus, this court has set forth the following elements for the offense: "'proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly and ... the commission of an overt act in furtherance of the conspiracy.'" *Reborn Enterprises, Inc. v. Fine Child, Inc.,* 590 F.Supp. 1423, 1451 (S.D.N.Y.1984), *aff'd per curiam,* 754 F.2d 1072 (2d Cir.1985).

■ As stated previously, the requisite specific intent can be inferred from defendants' conduct. While this Court does not necessarily endorse the inferences the plaintiffs draw from the defendants' conduct, the Court cannot conclude that the inferences and innuendos are untenable and meritless as a matter of law. For this reason, the summary judgment motion on this claim must be denied.

### V. State Law Claims

The plaintiffs' state law claim is brought under the Donnelly Act, New York's antitrust statute. General Business Law § 340. This statute is essentially the state counterpart to section one of the Sherman Act and has been so interpreted. *See State v. Mobil Oil Co.,* 38 N.Y.2d 460, 463, 344 N.E. 357, 381 N.Y.S.2d 426 (1976); *Uniroyal, Inc. v. Jetco Auto Service, Inc.,* 461 F.Supp. 350 (S.D.N.Y.1978). The Court denies the defendants' motion under this cause of action for the same reasons set forth regarding the federal claims.

### CONCLUSION

The defendants' motion for summary judgment is denied without prejudice to make another such motion after discovery on the issue of market definition, share and impact is completed. This discovery should be concluded by March 20, 1987. The par-

ties are to appear for a pretrial conference on April 7, 1987 at 10 a.m.

SO ORDERED.